# EXHIBIT A

Filing # 235770022 E-Filed 11/13/2025 06:19:42 PM
NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

**IN THE CIRCUIT COURT OF THE ELEVENTH JUDICIAL CIRCUIT**

**IN AND FOR MIAMI-DADE COUNTY, FLORIDA**

**CIVIL DIVISION**

**CIVIL CASE NO. 2025-009520-CA-01**

**ALEXANDER NEWTON,**

Plaintiff,

v.

**META PLATFORMS, INC.**

and

**REESE JONES,**

Defendants.

**FIRST AMENDED COMPLAINT**

**DEMAND FOR JURY TRIAL**

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

## COMPLAINT FOR DAMAGES

Plaintiff Alexander Newton ("Plaintiff"), an individual appearing *pro se*, sues Meta Platforms, Inc. ("Meta") and Reese Jones ("Jones") (collectively, "Defendants") and alleges as follows:

## PRELIMINARY STATEMENT

This case arises from a May 20, 2023 technology event in Miami, Florida. Defendant Reese Jones—publicly billed as a "Facebook Advisor" and promoting Meta initiatives and brands—loudly defamed Plaintiff moments after he criticized Meta's antisemitic content-moderation failures, and then physically seized Plaintiff's phone. Acting in Meta's interest, Jones committed defamation per se, battery, conversion, false imprisonment, tortious interference, and intentional infliction of emotional distress.

Meta received written notice beginning April 7, 2025, yet ratified Jones's conduct. Plaintiff respectfully demands a trial by jury on all issues so triable.

## I. JURISDICTION AND VENUE

1. **Subject-Matter Jurisdiction.** This Court has subject-matter jurisdiction under Article V, section 5(b) of the Florida Constitution and § 26.012(2)(a),

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

Florida Statutes, because the amount in controversy exceeds $50,000, exclusive of interest, costs, and attorneys' fees, and the claims sound in tort. Because the amount in controversy exceeds $50,000, this action is not cognizable in county court under § 34.01(1)(c); jurisdiction lies under § 26.012(2)(a).

2. **Personal Jurisdiction.** Personal jurisdiction exists under § 48.193(1)(a)2. because Defendants—personally or through an agent—committed tortious acts in Miami-Dade County, Florida, giving rise to the claims. Additionally, as to Meta and solely with respect to Meta's ratification of the torts alleged in Counts I–VII, personal jurisdiction exists under § 48.193(1)(a)6(a) because Plaintiff's injuries in Florida arise from Meta's acts or omissions outside Florida and, at or about the time of the injury, Meta was engaged in solicitation or service activities within Florida, including ongoing commercial relationships with Florida advertisers and event-related activities in Miami. This is specific jurisdiction and comports with due process because Defendants purposefully availed themselves of Florida, the claims arise out of or relate to those Florida contacts, and exercising jurisdiction is fair and reasonable.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

3. **Venue.** Venue is proper in Miami-Dade County under § 47.011, Florida Statutes, because the causes of action accrued in this County and at least one Defendant transacts substantial business here.

## II. PARTIES

4. Plaintiff Alexander Newton ("Newton") is a citizen of the United Kingdom. He is a Holocaust-awareness advocate, actor, and technology entrepreneur. At all relevant times Newton was physically present in Miami-Dade County, Florida, attending a public blockchain-and-technology event.

5. Defendant Meta Platforms, Inc. ("Meta") is a Delaware corporation with its principal place of business in Menlo Park, California. Meta regularly transacts business in Miami-Dade County and throughout Florida, including maintaining advertising relationships with Florida companies, and is subject to this Court's personal jurisdiction as alleged below.

6. Defendant Reese Jones is a resident of California. Since at least 2016 he has been represented at industry events as "Facebook Advisor," including on his LinkedIn profile and in materials promoting the May 20, 2023 Miami event. Meta issued no public disclaimer of that title and knowingly benefited from Jones's promotion of Meta initiatives. See Exs. A–C.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

## III. FACTUAL ALLEGATIONS

7. Plaintiff Alexander Newton is a citizen of the United Kingdom and a creative entrepreneur active in the entertainment and technology industries. He is a producer, award-winning actor, and Holocaust-awareness advocate. He is also the founder of two start-ups, DropMagnet and MovieKey, both of which held significant pre-seed valuations.

8. In September 2022, Plaintiff and his advertising manager purchased paid advertisements for Plaintiff's Holocaust-themed film, *Beautiful Blue Eyes*, through Meta Platforms, Inc.'s advertising system. The film, written and directed by Plaintiff's father, was made in honor of Plaintiff's grandfather, a Holocaust survivor orphaned during World War II.

9. Meta initially approved the advertisements but later rejected them under its "Implied Race" policy, permanently disabled the advertising accounts, and refused reinstatement even after manual appeals. The ban severely disrupted the film's 400+ screen theatrical release.

10. Newton and his father subsequently sued Meta in California, alleging that the advertising ban on *Beautiful Blue Eyes* stemmed from antisemitic bias and the selective, bad-faith application of Meta's content policies. *A 2019 Verge exposé*, *The Trauma Floor*, documented Holocaust-denial and overt

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

antisemitism among U.S. Facebook moderators, underscoring a hostile internal culture. Plaintiff claimed to Jones that those moderators weaponized Meta's "Implied Race" rule as pretext to bar paid promotion of the film and its companion song, even as Meta left antisemitic posts online (see ¶33).

11. On May 20, 2023, Newton appeared at the "Legion Mastermind" technology event in Miami, Florida, to present DropMagnet and MovieKey to prospective investors and partners. Plaintiff was given a free ticket to the event after meeting organizers and impressing them with demos of his blockchain-based platforms. Plaintiff was told by organizers that the purpose of the event was to connect founders and investors in the blockchain space. Event organizers brought Defendant Jones onstage as a "Facebook Advisor," a designation mirrored on his LinkedIn profile and on event flyers distributed through Meta-owned platforms such as Instagram (see Ex. C). He claims to have held that designation from 2016 to the present. Meta lodged no objection, disclaimer, or limitation on Jones's use of that title. Jones's résumé includes a continuous series of public events where Jones was billed as an 'Advisor to Facebook', among them a July 15, 2019, panel at CryptoMondays in San Francisco titled "Panel On Facebook's Libra Cryptocurrency," where Jones was introduced alongside other experts as "an

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

advisor to Facebook". This event was promoted publicly, including on X by BeFastTV, without any objection from Meta, allowing Jones to leverage his advisor title to discuss Meta's initiatives in a way that benefited Meta's promotion of Libra. This pattern extends to earlier engagements, such as Jones's participation in blockchain conferences in 2018, including the Global Blockchain Forum in April 2018, where he was publicly presented as a "Facebook Adviser" in promotional materials and articles, further solidifying his apparent authority to represent Meta in technology and policy discussions without any disclaimer or limitation from Meta.

12. Newton—and other attendees within earshot—had ample reason to view Jones as speaking for Meta: several attendees referred to him as the event's "Facebook VIP," convincing Newton that Jones was a legitimate Meta representative. At approximately 11:30 p.m. on the event floor, Jones questioned Newton about DropMagnet and MovieKey, pressing for specifics on how DropMagnet planned to out-compete OpenSea and whether Meta's own marketplace would pose a conflict. Newton replied that a licensing deal with a marquee investor was set to close at 10:00 a.m. the following morning at the event venue and that finalizing the deal would materially accelerate

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

DropMagnet's expansion. Jones stated that he was an official Meta representative with insider knowledge of the company.

13. During a live demo of MovieKey, with Jones actively watching, Newton showed him the page for *Beautiful Blue Eyes* displayed on the platform. As they discussed the film, Newton mentioned that he was actively suing Meta, arguing that the company's ad ban on the film was discriminatory—particularly given that Meta had approved ads for Netflix's similarly titled film, *The Pale Blue Eye*. Jones's demeanor shifted immediately; he questioned Newton's motives for releasing the film and suggested that Newton was exploiting the Holocaust for personal gain.

14. Jones stated loudly, within earshot of other attendees: "Meta did nothing to damage your film. You just want to make money off of the Holocaust. If you really cared about Holocaust education, you'd put the film on YouTube for free." In reasonable reliance on Jones's authority, his introduction as a "Facebook Advisor," and—as later confirmed in ¶17—his first-person "we" statements, Plaintiff continued the conversation in good faith to explore resolving the Meta ad-ban dispute and remained within arm's reach while doing so. But for that reliance, Plaintiff would have disengaged and moved away. Jones's ensuing defamatory outburst and physical lunge occurred

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

during and because of that conversation, which Plaintiff undertook in reliance on Jones's apparent authority; as further alleged in ¶¶ 29–32, Meta knew of and tolerated Jones's continued use of that title. The cause of Jones's defamation, lunge, and extortionate conduct ("delete the video [evidence] or I'm not giving your phone back") was to protect Meta's interests.

15. His first-person 'we' statement concerning Meta's moderation practices, alleged in ¶17, directly precipitated his defamatory outburst. Jones then sought to protect Meta from the consequences of that statement by attempting to destroy Plaintiff's reputation and suppress the video evidence at a public event.

16. In response to Jones's defense of Meta, Newton calmly defended *Beautiful Blue Eyes*, its investors, and its distribution strategy, reiterating his belief that Meta bore liability for the wrongful ad ban. He cited antisemitic content that Meta had failed to remove—including a Facebook post captioned *"The Ideal Jewish Body,"* which remained live at the time—and referenced *The Verge* investigation *The Trauma Floor*, which documented Holocaust denial and antisemitic conduct among U.S.-based Facebook moderators. Speaking in good faith, Newton offered to assist Meta in addressing antisemitism

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

within its moderation systems and proposed that cooperation as a constructive path toward amicably resolving the pending litigation.

17. Jones then responded, "What should we do—fire all the MAGA-nut antisemite Holocaust deniers and the President?" Using the first-person plural while being presented as a "Facebook Advisor," Jones held himself out as speaking for Meta to Plaintiff. He then paused, widened his eyes, and his jaw dropped, appearing to realize what he had said. Moments later, in a raised voice and within earshot of nearby attendees, Jones falsely and loudly accused Plaintiff of having advocated during their conversation a Holocaust against "woke people," knowing that Plaintiff had said no such thing. Several bystanders turned toward the outburst, and Plaintiff immediately experienced significant emotional distress. In a rebuttal video recorded moments later, background voices are audible as Plaintiff refuted Jones's accusation; as Plaintiff recorded that rebuttal, Jones seized Plaintiff's phone—evidencing malice and a motive to suppress the refutation. Jones acted, at least in part, to protect Meta's interests following his "we" statement, precipitating the defamatory outburst and the seizure and conditional withholding of Plaintiff's phone to suppress the rebuttal video.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

18. The accusation was entirely false. Newton has never made any such statement and is widely recognized for Holocaust-remembrance advocacy, creative work honoring survivors, and preserving his family's legacy. The slander was defamatory per se, directly undermining Newton's public identity and attributing to him views universally condemned as genocidal hate speech.

19. Visibly shaken and experiencing panic, Newton began recording a brief rebuttal video on his phone. The 40-second clip captured him stating, "Everyone deserves life… you're lying… I'm offering you [meaning Meta] an olive branch… you liar." Jones stood silently throughout and made no attempt to contradict the rebuttal or Plaintiff's direct statement, *"I'm offering you an olive branch,"* which further demonstrates that Plaintiff was addressing Meta and relied on Jones's apparent capacity as its representative.

20. While Plaintiff's rebuttal video was still recording, Jones lunged toward Newton, forcefully grabbed the phone, and clamped down on Newton's fingers. As Jones pulled the device toward himself, his grip caused the phone to lock and the recording to cut off mid-sentence; the final frame of the preserved clip shows Jones's feet. Newton felt immediate pain and demanded the device's return multiple times, but Jones refused. The partial

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

rebuttal clip captures Jones's silence immediately before the lunge and the beginning of the phone seizure. A second video, recorded after recovering the phone, captures the accomplice's statements and corroborates the security guard's account of Jones's refusal to return the device.

21. Plaintiff fetched a security guard and brought him to Jones, who was still holding the phone. Jones again refused to hand it over, claimed that Newton had recorded him illegally, and conditioned return on deletion of the video. In a later video recorded by Newton, the security guard corroborates that Jones refused to return the phone when asked.

22. Newton sought help from one of the event organizers, but instead of assisting, the individual aligned with Jones. Jones repeated the false accusation of illegal recording and said the video must be deleted. The organizer (now accomplice) then said, "Give me the phone," took it off Jones, and walked toward the entrance with the phone. Jones remained inside. Newton followed and found himself outside the entrance, where the accomplice held the phone and within earshot of bystanders—echoed the illegal‑recording claim and demanded deletion.

23. After Newton threatened to call the police, he recovered the phone and began recording. During the ensuing approximately three‑minute physical

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

block, the accomplice—still demanding deletion—echoed Jones's unlawful-recording claim and said, "Did you ask to film him in a private place?", falsely implying a reasonable expectation of privacy. In fact, the event was a ticketed, public function, was professionally recorded, and many attendees were openly filming without hindrance. Although Jones's initial illegal-recording accusation is not captured on audio—because the recording cut off when Jones grabbed and locked the phone—the accomplice's statement is recorded.

24. Jones and the accomplice held Newton's phone for approximately six minutes, during which time Newton was left without access to transportation, payment methods, or any means of seeking help while return of the device was conditioned on the permanent deletion of video evidence clearly showing battery. It was near midnight, he was in a foreign city, and he reasonably feared for his safety. During that time, the accomplice echoed Jones's false accusations of "illegal recording" and "privacy violations" as pretexts to pressure Newton into deleting the video. This occurred within earshot of passers-by in the street and other attendees who were entering or exiting or lingering by the entrance to the event. While in possession of the phone after the initial snatch, Jones manipulated the screen, leading Newton

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

to believe he was attempting to access and delete the rebuttal video. **However, the phone had inadvertently locked when he forcibly grabbed it. Together, their withholding of the phone confined Newton at a public event near midnight, with return conditioned on deletion,** constituting false imprisonment. Furthermore, while outside and beside a wall, the accomplice blocked Newton's path while still attempting to coerce deletion of the video evidence, preventing him from leaving safely once the phone had been returned.

25. The event was public; tickets were available online, professionally recorded, and openly filmed by many attendees. There was no reasonable expectation of privacy.

26. The phone contained the only copy of Plaintiff's contemporaneous rebuttal and was of evidentiary value in connection with the California litigation. Its seizure and attempted destruction constituted a wrongful taking and conversion, intended to deprive Plaintiff of its use and evidentiary value and to suppress damaging evidence of Jones's admission and defamatory accusation.

27. As a direct result of the encounter, Plaintiff's scheduled 10:00 a.m. licensing meeting collapsed and was never rescheduled. The accomplice—who had

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

positioned himself as an introducer, networker, and potential collaborator—also withdrew interest. As a result, DropMagnet lost a critical commercial trajectory. Prior industry press had recognized DropMagnet's potential to outperform OpenSea, and the lost licensing deal had substantial value. It was expected to materially accelerate DropMagnet's growth and valuation.

28. In the early hours of May 21, 2023, Newton prepared and sent a contemporaneous incident report to his father, documenting the events in detail. He lost sleep and experienced acute emotional distress. In the months that followed, Newton continued to suffer from PTSD-like symptoms that required medical treatment in the United Kingdom.

29. At the time of the incident, prior, and continuing thereafter, Jones publicly identified himself as a "Facebook Advisor" on LinkedIn and in event materials distributed on Meta-owned platforms. With knowledge of these public representations, Meta's brand-protection, HR, and legal teams had both the capacity and opportunity to challenge or correct them but did not. Jones's LinkedIn profile also lists him as "Associate Founder" at Singularity University. See Exs. A–C.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

30. On April 7, 2025, Plaintiff sent a written pre-suit notice (designated under Fla. Stat. § 90.408) and evidence packet about the Miami incident to Meta Legal (attn: Chief Legal Officer Jennifer Newstead) by e-mail; courier delivery was confirmed April 15, 2025. The packet enclosed: (i) a detailed written report of the event (including Jones's first-person 'we' admission about Meta's moderation practices) and torts with attached still frames from a video showing Jones snatching Plaintiff's phone; (ii) a screenshot from the Legion Mastermind Instagram account presenting "Reese Jones — Advisor to Facebook"; and (iii) screenshots of antisemitic posts that, despite prior reports, remained live on Facebook and caused Plaintiff emotional distress. After no acknowledgment, Plaintiff sent a follow-up on April 30, 2025. Upon information and belief, Ms. Newstead forwarded the matter to outside counsel Michelle Visser (Orrick). On information and belief, at no time did Meta properly investigate or condemn Jones's conduct, discipline him, correct his public presentation as a "Facebook Advisor," or acknowledge the antisemitic posts. These communications are referenced solely to establish Meta's notice and knowledge, not to prove liability or amount.

31. Photographs, promotional materials, and public platform content show Jones billed as a **"Facebook Advisor"** at events between 2019 and 2023. On

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

Meta-owned platforms (Facebook and Instagram), Meta had—and has—the ability under its authenticity and misrepresentation policies to **take corrective action on posts presenting Jones as a current "Facebook Advisor," and to publish a public disavowal on its official accounts; it did neither. Upon information and belief,** Meta also has brand-protection channels through which it can request corrections or removals of misleading affiliations on third-party platforms such as LinkedIn, Crunchbase, and RocketReach, **yet it has not requested removal or correction of Jones's claimed "Advisor – Facebook" role on those services. Meta has not corrected Jones's affiliation, disavowed the conduct captured on video, or disciplined him.**

32. With knowledge of the material facts that Jones had defamed and attacked Plaintiff in order to prevent fallout from his first-person "we" admission about Meta's moderation practices—an admission relevant to Newton's California action against Meta and **potentially damaging to Meta's brand image** (see ¶¶ 11, 14–20, 29–31)—Meta neither disavowed nor disciplined Jones, **nor stated that Jones's admissions or accusations were untrue**, and continued to accept the benefits of his conduct—including reputational and litigation-position advantages in this action and in related or foreseeable

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

proceedings. During this same period, Meta **declined to use corrective measures within its control on its own platforms or to request removal or correction of Jones's public Meta affiliation on third-party platforms.** Despite notice of Facebook and Instagram posts presenting Jones as a "Facebook Advisor," Meta left those posts live and issued no public disavowal on its official accounts. **This knowledge, non-repudiation, and acceptance of benefits constitute ratification.** Before the May 20, 2023 event, Jones's apparent authority arose from Meta's manifestations then in place (¶¶ 11–17); Meta's post-notice knowledge and failure to repudiate further ratified his conduct and continued to cause reasonable third parties, including but not limited to Plaintiff, to believe he was an official agent working with the company. Meta's ongoing tolerance of Jones's "Facebook Advisor" presentation perpetuates that appearance and supports injunctive relief.

33. Meta also ignored Plaintiff's report of antisemitic posts. The "Ideal Jewish Body" post remained live on Facebook, and a moderation response confirmed no removal. Additional Holocaust-denial content, such as a swastika-laden "Anne Frank puzzle box" post, likewise remains live despite reports.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

34. Meta owed Plaintiff and the public a duty of care in supervising individuals who publicly represent its brand at events where conversations involving content moderation, antisemitism, and policy issues may take place. Meta breached that duty through inaction, meeting the standard for negligent supervision under Florida law.

35. Meta's own Community Standards and Event-Misconduct policies prohibit retaliation against individuals who raise hate-speech concerns and require timely investigation of misconduct reports. Despite these policies, Meta failed to investigate for over three weeks after receiving formal notice of physical harm, evidence suppression, and hate speech. The hate speech remains live, as do posts showing Meta condones Jones appearing on Instagram posts as "Facebook Advisor" despite having a policy of removing content that falls under "misinformation." Some of Meta's highest level legal decision-makers have seen the screenshots, and allowed the posts to remain live, condoning the continued appearance of apparent authority.

36. Plaintiff contends that Jones's conduct was not personal or isolated but a direct extension of Meta's politically-motivated content-suppression regime. Jones's retaliation followed immediately upon Plaintiff's protected criticism at a public forum where Jones appeared to speak for Meta.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

37. Near midnight, in an unfamiliar part of Miami and separated from his phone—which contained his payment methods and rideshare access—**Plaintiff felt vulnerable and reasonably feared escalation.** Presented as a "Facebook Advisor" and speaking in the first-person plural "we," Jones had just seized the phone, demanded deletion of the rebuttal video, and involved an accomplice who repeated accusations of "illegal recording." **Plaintiff reasonably believed Jones could summon additional personnel or associates to force deletion or further restrain him**, and he experienced acute fear while attempting to leave and obtain transportation.

38. During the event, **Craig Shah** (reasonably believed to be an investor in the event and a business associate of Reese Jones and his accomplice) reviewed **DropMagnet** and **MovieKey**. Shah stated, **"I love it—I'm going to license it. Come back tomorrow at 10:00 a.m. and we'll finalize the deal,"** exchanged contact information with Plaintiff, and posed for a photo confirming the 10:00 a.m. meeting.

39. Minutes before Jones's outburst, Plaintiff told Jones about the **10:00 a.m. meeting with Mr. Shah** to finalize the **DropMagnet license** at the same venue.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

40. After Jones's defamatory outburst and phone seizure, **Jones's accomplice** who is also **Shah's associate**, told Plaintiff words to the effect of, **"I don't want to get upset… but I'm going to get upset… I met a really cool person the other day… I thought you'd be really good for what I'm trying to build."**

41. Jones knew that Plaintiff had a scheduled 10:00 a.m. licensing meeting with investor Craig Shah the next morning and that Shah was a key gateway to the broader Legion investor network. By publicly defaming and humiliating Plaintiff with fabricated accusations, assaulting him, seizing his phone, coercing him to delete the video evidence, and enlisting the accomplice (who was also connected to Shah) to threaten Plaintiff with exclusion from that very network, Jones intended, or was substantially certain, that Plaintiff would be too fearful and humiliated to return to Shah or to contact anyone associated with Jones or the event. After the incident, Plaintiff saw a photograph of Shah and Jones embracing, reinforcing his belief that Shah was closely aligned with Jones and that re-engaging would risk further harm and reputational damage. As a direct and foreseeable result of this intimidation and humiliation, Newton reasonably refrained from further

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

contact, the Shah licensing deal collapsed, and Plaintiff lost broader investor opportunities within the Legion network.

42. As a result, Plaintiff lost the **economic value** of the Shah license (to be proven at trial), together with reputational harm within the investor community at the event including, and as further evidenced on video, a business relationship with Jones's accomplice, who was a prominent figure in the Miami blockchain investor and founder community.

43. As a **direct and foreseeable result** of Jones's public outburst, defamatory accusations, and seizure of Plaintiff's phone, **Plaintiff did not attend** the scheduled **10:00 a.m. meeting** with Mr. Shah. Plaintiff reasonably believed, based on the **associate's statement** implying that the network would not do business with him unless he deleted the video evidence of Jones's assault, that the opportunity had been **withdrawn**, and further believed returning would be **unsafe** and **futile** while Jones may have been present at the venue.

44. Taken together, the facts establish that Plaintiff was retaliated against by a representative of Meta for exercising protected speech critical of a broken content moderation operation, and that Meta ratified that conduct by silence, inaction, and continued allowance of Jones's public image. As of the filing

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

of this First Amended Complaint in November 2025, Jones still holds himself out as a Facebook Advisor on LinkedIn.

45. **Prior to notice of the May 20, 2023 incident**, Meta had the means and duty to monitor and control Jones's public use of the 'Facebook Advisor' title.

46. Jones has provided services to Meta at least since 2016. **Upon information and belief, Meta internally classified Jones as a contingent worker in connection with his "Advisor – Facebook" role.** Meta, having bestowed the title on him for public use, has condoned his ongoing use of the title at blockchain industry events and online, including on LinkedIn and Crunchbase, where as of November 13, 2025, the webpage states "Reese Jones currently works as an Advisor for Facebook" (Ex. D).

47. Upon information and belief, discovery will reveal top executives at Meta knowingly condone Reese Jones's use of the title they gave to him, and that Meta actively monitors and manages its brand on LinkedIn and Crunchbase.

48. Prior to May 20, 2023, Meta had full awareness of Jones's 'Facebook Advisor' title use online and at industry events, and made no public correction as to his status or authority—instead they condoned his use of the title, negligently manifesting scenarios where the public would rely on Jones making "we" statements or acting to speak on Meta's behalf, while

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

benefiting from his promotion of their brand and initiatives. On information and belief, discovery will reveal Jones also reported innovations in blockchain to Meta that he discovered in the course of his public networking as an agent.

49. The appearance of Jones with an official Meta role extends to RocketReach, a website listing contact details for workers, (Ex. E) where he appears as 'Advisor @ Facebook' with an official @meta.com email address.

50. Meta is vicariously liable under the following alternative theories:

**a. Actual Authority.** Upon information and belief, discovery will reveal that Jones had actual authority from Meta to style himself as a 'Facebook Advisor' in public and to promote Meta's interests at industry events. This authority extended to speaking on Meta's behalf in contexts like the May 20, 2023 event, where Jones made a first-person "we" statement about Meta's internal moderation practices (¶17), and then committed a range of torts at least in part to cover it up and protect Meta from reputational, litigation, and financial harm arising from the disclosure. His torts occurred within the scope of this authority, as it was motivated at least in part to serve Meta's interests.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

51. **b. Apparent Authority.** Meta manifested Jones's authority through its knowing condonation of his public use of the "Facebook Advisor" title since at least 2016, including multiple public appearances on panels and at events, and the May 20, 2023 event (Exs. A–C), without disclaimer, while benefiting from his promotion of Meta initiatives like Libra and blockchain innovations. Upon information and belief, discovery will reveal Meta's awareness and acceptance of Jones's work, allowing third parties like Plaintiff to reasonably believe Jones acted for Meta. Plaintiff relied on these manifestations by continuing the conversation to resolve a Meta-related dispute (¶¶12–17), leading to the torts which caused injury. This satisfies apparent authority under Mobil Oil Corp. v. Bransford, 648 So. 2d 119 (Fla. 1995), and Roessler v. Novak, 858 So. 2d 1158 (Fla. 2d DCA 2003), as Meta knowingly or negligently permitted the holding out.

52. **c. Ratification (Alternative).** With full knowledge of the material facts via Plaintiff's April 7 and April 30, 2025 notices (including video evidence of the assault) and knowledge of Jones's "we" statement from Plaintiff's written report described in ¶30, Meta accepted the benefits of Jones's conduct by declining public corrective measures or disavowals, thereby continuing to benefit from Jones's ongoing promotion of the Meta brand,

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

standing in the blockchain industry, and intelligence-gathering on innovations (¶48). This inaction, coupled with knowledge and tied benefits, implies ratification under Deutsche Credit Corp. v. Peninger, 603 So. 2d 57 (Fla. 5th DCA 1992), and Perera v. Diolife LLC, 274 So. 3d 1119 (Fla. 4th DCA 2019), as his defamatory "Holocaust" statement and other torts thereafter served to protect Meta's interests.

## **CAUSES OF ACTION**

*(Defendants are Meta Platforms, Inc. ("Meta") and Reese Jones ("Jones") unless otherwise noted.)*

## **COUNT I – DEFAMATION PER SE**

*(Against Jones; Meta vicariously)*

53. Plaintiff realleges and incorporates ¶¶ 1–52 as if fully set forth herein, **and further alleges that this Count arises out of the same conduct, transaction, or occurrence as the original complaint filed May 20, 2025, and therefore relates back under Fla. R. Civ. P. 1.190(c).**

54. This claim targets **provably false factual statements (including by implication)**, not opinion, rhetoric, or policy debate.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

55. Jones publicly stated that Plaintiff advocated a Holocaust against "woke people," and later accused Plaintiff of "illegally recording" him. See ¶¶ 17, 21–24.

56. Both statements are false and were published to third parties. The **'illegal recording'** accusation **imputes criminal conduct** and constitutes **defamation per se**; the separate **'Holocaust'** statement is independently defamatory and disparages Plaintiff in his vocation, constituting **defamation per se** (injury in trade/profession) or, alternatively, **defamation per quod** with actual damages.

57. Jones published the accusation that Plaintiff was illegally recording, by words and implication, by stating it directly to the security guard and his accomplice and nearby attendees and by procuring its republication when the accomplice repeated the charge aloud while holding Plaintiff's phone. Each repetition was a separate publication. Although the initial illegal‑recording accusation is not on audio—because the recording cut off when Jones grabbed and locked Plaintiff's phone—Plaintiff personally heard Jones and the accomplice make the accusation multiple times. On a later clip recorded after Plaintiff had recovered his phone but was still being intimidated by the accomplice within earshot of others, the accomplice is

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

heard saying, "Did you ask to film him?" (see ¶23), reinforcing the same charge. The defamatory statements were made in a crowded, ticketed venue, within earshot of attendees, passers-by, and security. Jones used the illegal-recording accusation as a pretext to justify seizing Plaintiff's phone while Plaintiff was lawfully filming a rebuttal to Jones's earlier defamatory "Holocaust" statement, demonstrating knowledge of falsity or reckless disregard for the truth. The accusation is false because the recording occurred in a public, crowded setting with no reasonable expectation of privacy. Jones and his accomplice used the pretext of 'illegal recording' and 'recording without permission' in an attempt to coerce destruction of evidence that Jones sought to destroy to protect his interests as well as Meta's.

58. **Professional injury (alternative).** Independently, because Plaintiff is a filmmaker and technology entrepreneur whose work depends on **lawful recording, content-rights compliance, and trust with venues, partners, and investors**, the accusation that he was **"illegally recording"** necessarily tends to **injure him in his trade or profession**, constituting **defamation per se**; or, in the alternative, **defamation per quod** with actual damages.

59. Jones published **two separate false statements of fact**:

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

**(a) “Illegal recording.”** Jones (and his accomplice, at his direction) stated by words and implication that Plaintiff was **“illegally recording”** and that recording his rebuttal video and Jones’s attack was “against the law.” This **imputes criminal conduct** and constitutes **defamation per se**; damages are presumed. The accusation is false because the recording occurred in a crowded, ticketed public setting with no reasonable expectation of privacy. It is an especially damaging allegation considering that Plaintiff is a film industry professional.

**(b) “Holocaust” smear.** Jones also loudly stated within earshot of other attendees that Plaintiff had **advocated a Holocaust against “woke people.”** This statement is false and independently defamatory. Given Plaintiff’s professional identity as a Holocaust-remembrance advocate and film industry professional, it **directly disparages Plaintiff in his vocation and community**, constituting **defamation per se** (injury in trade/profession), or, in the alternative, **defamation per quod** with actual damages, including the collapse of the scheduled 10:00 a.m. licensing meeting and related losses.

60. Plaintiff suffered presumed and actual damages, including reputational harm and business losses (¶¶ 27, 41–43).

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

61. At all relevant times, Jones **acted with actual malice—i.e., with knowledge of falsity or with reckless disregard for the truth**—and held himself out as speaking for Meta. He was introduced and displayed as a "Facebook Advisor" at the event and used the first-person plural ("**we**") while discussing Meta policy (see ¶¶ 12, 17). Together with his LinkedIn title and the event's marketing materials reflecting that affiliation (see ¶¶ 29–32), these **manifestations created apparent authority** on which Plaintiff reasonably relied. After written notice **beginning April 7, 2025,** Meta did not disavow, correct, or discipline Jones or his branding, thereby **ratifying** his conduct and publications (see ¶¶ 30–32).

62. Plaintiff **actually relied** on Meta's manifestations (including Jones's "Facebook Advisor" presentation and "we" statements) when he continued the discussion offering an "olive branch," which placed him within earshot of third parties as Jones made the defamatory publications. Plaintiff's **change in position**—remaining engaged in the meeting area rather than departing—was **caused by that reliance** and directly resulted in the publications. See ¶¶ 12, 14, 17, 19, 21–23.

63. Meta is vicariously liable under the theories of actual authority, apparent authority, and ratification as set forth in ¶¶50-52.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

**WHEREFORE,** Plaintiff respectfully requests entry of judgment on this Count in his favor and against **Reese Jones** and **Meta Platforms, Inc. (vicariously)**, awarding:

(a) **compensatory damages** in an amount to be determined at trial;

(b) **pre- and post-judgment interest** as permitted by law;

(c) **taxable costs** of suit; and

(d) **such other and further relief** as the Court deems just and proper.

**COUNT II – BATTERY**

*(Against Jones; Meta vicariously)*

64. Plaintiff realleges ¶¶ 1–52.

65. Jones intentionally and without consent grabbed Plaintiff's phone and clamped down on Plaintiff's fingers, causing pain and offense (see ¶ 20)**.**

66. The contact was harmful and offensive, satisfying the elements of battery under Florida law.

67. Meta is vicariously liable under the theories of actual authority, apparent authority, and ratification as set forth in ¶¶50-52.

**WHEREFORE,** Plaintiff respectfully requests entry of judgment on this Count in his favor and against **Reese Jones** and **Meta (vicariously)**, awarding:

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

(a) **compensatory damages** in an amount to be determined at trial;

(b) **pre- and post-judgment interest** as permitted by law;

(c) **taxable costs** of suit; and

(d) **such other and further relief** as the Court deems just and proper.

**<u>COUNT III – CONVERSION</u>**

*(Against Jones; against Meta vicariously)*

68. Plaintiff realleges ¶¶ 1–52.

69. Jones wrongfully exercised dominion over Plaintiff's phone and the unique, contemporaneously recorded rebuttal video file fixed on that device, depriving Plaintiff of its use and evidentiary value and cutting off further contemporaneous capture by causing the device to lock mid-sentence (¶¶ 20–26).

70. The deprivation was intentional and caused economic and property loss.

71. (Alternative – Trespass to Chattels). In the alternative to conversion, Jones intentionally interfered with Plaintiff's possessory interest in the phone by seizing it and conditioning return on deletion of the video, thereby impairing its condition, quality, and value for evidentiary use; Plaintiff suffered resulting damages.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

72. Meta is vicariously liable under the theories of actual authority, apparent authority, and ratification as set forth in ¶¶50-52.

**WHEREFORE,** Plaintiff respectfully requests entry of judgment on this Count in his favor and against **Reese Jones** and **Meta (vicariously)**, awarding:

(a) **compensatory damages** in an amount to be determined at trial;

(b) **pre- and post-judgment interest** as permitted by law;

(c) **taxable costs** of suit; and

(d) **such other and further relief** as the Court deems just and proper.

**COUNT IV – FALSE IMPRISONMENT**

*(Against Jones; Meta vicariously)*

73. Plaintiff realleges ¶¶ 1–52.

74. Jones and his accomplice confined Plaintiff at the event for approximately nine minutes—about six minutes during the initial seizure/withholding and about three additional minutes when the accomplice physically blocked Plaintiff after the phone was returned—blocking his exit and conditioning release on deletion of evidence (¶¶ 22–24).

75. Based on Jones's lunge, seizure of the phone, refusal to return it unless the video was deleted, and continued presentation as a "Facebook Advisor,"

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

**Plaintiff reasonably believed additional harmful contact or restraint was imminent**, including that Jones could enlist others at the venue to compel deletion before Plaintiff could safely depart.

76. Plaintiff had no reasonable means of escape without his phone, which he relied on as his only means for payments and transport, and feared further harm.

77. Plaintiff recovered his phone from the accomplice after threatening police involvement. Still, the accomplice continued to try to coerce deletion on Jones's behalf, stating, "for some reason you're holding onto your phone tightly." Moments later, Plaintiff stated, "I'm leaving now," and was physically obstructed from leaving while trying to move away from the accomplice. The accomplice did not immediately step aside and instead became angry and again obstructed Plaintiff from leaving while still trying to coerce deletion on Jones's behalf. During this approximately three-minute obstruction, the audio captures the accomplice saying, "Did you ask to film him?" (see ¶23). Between Plaintiff stating "I'm leaving now" and being able to physically leave, approximately three additional minutes passed.

78. These acts constitute false imprisonment under Florida law.

NOT AN OFFICIAL COPY - PUBLIC ACCESS NOT AN OFFICIAL COPY - PUBLIC ACCESS

79. Meta is vicariously liable under the theories of actual authority, apparent authority, and ratification as set forth in ¶¶50-52.

**WHEREFORE,** Plaintiff respectfully requests entry of judgment on this Count in his favor and against **Reese Jones** and **Meta (vicariously),** awarding:

(a) **compensatory damages** in an amount to be determined at trial;

(b) **pre- and post-judgment interest** as permitted by law;

(c) **taxable costs** of suit; and

(d) **such other and further relief** as the Court deems just and proper.

## COUNT V – TORTIOUS INTERFERENCE WITH AN ADVANTAGEOUS BUSINESS RELATIONSHIP

*(Against Jones; Meta vicariously)*

80. Plaintiff realleges ¶¶ 1–52 as if fully set forth herein.

81. Plaintiff had a prospective substantial licensing agreement set for execution the next morning (¶¶ 38–39).

82. Jones knew of this relationship (¶¶ 12, 39). He intentionally and unjustifiably disrupted it through defamation, battery, seizure of Plaintiff's phone, and by recruiting an accomplice who was connected to the prospective investor.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

83. As a result, the licensing deal collapsed and all associated investor interest evaporated (¶¶ 27, 41–43), causing Plaintiff significant economic loss.

84. Meta is vicariously liable under the theories of actual authority, apparent authority, and ratification as set forth in ¶¶50-52.

**WHEREFORE,** Plaintiff respectfully requests entry of judgment on this Count in his favor and against **Reese Jones** and **Meta (vicariously),** awarding:

(a) **compensatory damages** in an amount to be determined at trial;

(b) **pre- and post-judgment interest** as permitted by law;

(c) **taxable costs** of suit; and

(d) **such other and further relief** as the Court deems just and proper.

## COUNT VI – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (IIED)

*(Against Jones; Meta vicariously)*

85. Plaintiff realleges ¶¶ 1–52.

86. Jones's conduct—publicly accusing Plaintiff of genocidal intent, physically assaulting him, seizing evidence, and imprisoning him—was extreme and outrageous (¶¶ 17–26).

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

87. Jones intended to cause, or recklessly disregarded the probability of causing, severe emotional distress.

88. Plaintiff suffered severe emotional distress requiring medical treatment (¶ 28).

89. Jones's conduct was **extreme and outrageous**: he publicly leveled a fabricated, stigmatizing accusation, then **seized Plaintiff's phone to suppress the rebuttal** and **conditioned its return on deletion**—late at night, in a crowded setting, to a visiting U.K. citizen without immediate access to transportation or payment. Jones **acted intentionally or with reckless disregard** of the high probability of causing severe emotional distress. **As a direct and proximate result, Plaintiff suffered severe emotional distress that persisted for months**, including acute anxiety, sleep disturbance, hypervigilance, and episodes of panic; he **sought medical treatment in the United Kingdom.**

90. Meta is vicariously liable under the theories of actual authority, apparent authority, and ratification as set forth in ¶¶50-52.

**WHEREFORE,** Plaintiff respectfully requests entry of judgment on this Count in his favor and against **Reese Jones** and **Meta (vicariously),** awarding:

(a) **compensatory damages** in an amount to be determined at trial;

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

(b) **pre- and post-judgment interest** as permitted by law;

(c) **taxable costs** of suit; and

(d) **such other and further relief** as the Court deems just and proper.

## COUNT VII – ASSAULT

*(Against Jones; Meta vicariously)*

91. Plaintiff realleges and incorporates by reference ¶¶ 1–52.

92. Under Florida law, assault is an intentional, unlawful threat by word or act to do violence to another, coupled with an apparent ability to do so, creating a well-founded fear in the other person that such violence is imminent.

93. At approximately 11:30 p.m. on May 20, 2023, at the Legion Mastermind event in Miami, Defendant Jones lunged toward Plaintiff and **seized** Plaintiff's phone, **clamping down on Plaintiff's fingers**. **(See ¶ 20.)**

94. Jones's lunge constituted an intentional, unlawful act that created in Plaintiff a well-founded and reasonable fear that immediate harmful or offensive contact was about to occur.

95. The threatened contact was then consummated by harmful and offensive physical contact (battery), which is separately pled in Plaintiff's battery count.

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

96. Jones had the apparent ability to carry out further threatened contact, and Plaintiff in fact experienced fear and apprehension of imminent violence, including when he refused to comply with Jones's demand to delete the evidence.

97. After the incident inside the venue, Plaintiff remained outside, fearful for his safety, avoiding walking down dark roads and instead attempting to wait for an Uber, believing that Jones—who had demanded deletion of evidence to justify retaining the phone—would again attempt to seize it to suppress the legally recorded video **(**see ¶¶ 20–24**)** showing Jones's attack and Plaintiff's rebuttal to Jones's false and defamatory statement.

98. As a direct and proximate result of Jones's assault, Plaintiff suffered physical injury, emotional distress, and economic damages.

99. Based on Jones's lunge, seizure of Plaintiff's phone, refusal to return it unless the video was deleted, and his continued presentation as a "Facebook Advisor," Plaintiff reasonably believed additional harmful contact or restraint was imminent, including that Jones could enlist event staff, bystanders, or associates at the venue to compel deletion before Plaintiff could safely depart. Given Jones's presented Meta affiliation and his use of "we," Plaintiff also reasonably feared that Jones could contact

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

Meta-affiliated personnel or other associates to further interfere with Plaintiff's person or property (including additional attempts to seize the phone) to suppress the video.

100. Meta is vicariously liable under the theories of actual authority, apparent authority, and ratification as set forth in ¶¶50-52.

**WHEREFORE,** Plaintiff respectfully requests entry of judgment on this Count in his favor and against **Reese Jones** and **Meta (vicariously)**, awarding:

(a) **compensatory damages** in an amount to be determined at trial;

(b) **pre- and post-judgment interest** as permitted by law;

(c) **taxable costs** of suit; and

(d) **such other and further relief** as the Court deems just and proper.

## PRAYER FOR RELIEF

Plaintiff respectfully requests judgment against Defendants, **severally and—for intentional torts—jointly as permitted by law**, for

A. **Compensatory and consequential damages** in amounts to be proven at trial;

B. **Pre- and post-judgment interest** as permitted by law;

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

C. **Costs of this action** as permitted by law;

D. **Leave to seek punitive damages** pursuant to section 768.72, Florida Statutes, upon evidentiary proffer and order of the Court;

E. **Such other and further relief** as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all issues so triable.

Dated: November 13, 2025

Respectfully submitted,

/s/ Alexander Newton

Alexander Newton

Pro Se

**Plaintiff designates** anewton@newtonhouse.com **as the primary e-mail for service under Rule 2.516; secondary:** anewton2@newtonhouse.com

(346) 346-0829

11987 Southern Blvd

#1078

Royal Palm Beach FL 33411-7619

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that no service of the foregoing First Amended Complaint has been made, as no defendants have been served with process or appeared in this action.

/s/ Alexander Newton

November 13, 2025

NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

# EXHIBITS

## EXHIBIT A

Screenshot (captured November 11, 2025) of Reese Jones's LinkedIn profile showing the Facebook badge and identity details.




## EXHIBIT B

Screenshot (captured November 11, 2025) of Reese Jones's LinkedIn "Experience" listing "Advisor – Facebook" with dates



NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

**EXHIBIT C**

Instagram story from the Legion Mastermind account (captured November 11, 2025) billing "Reese Jones — Advisor to Facebook."



NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

# EXHIBIT D

Screenshots (captured November 13, 2025). Crunchbase for Reese Jones.









NOT AN OFFICIAL COPY - PUBLIC ACCESS - NOT AN OFFICIAL COPY - PUBLIC ACCESS

# EXHIBIT E

Screenshot (captured November 13, 2025) RocketReach for Reese Jones.

